United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT FREUND,<br>Plaintiff,<br>v.<br>GROUPON, INC.,<br>Defendant. | Case No. 3:26-cv-05733-JSC<br>**ORDEER RE: MOTION TO TRANSFER VENUE OR COMPEL ARBITRATION**<br>Re: Dkt. No. 18 |

Plaintiff Robert Freund, individually and on behalf of a putative class action, brings this suit against Defendant Groupon, Inc., alleging it continued to contact Plaintiff despite his request to be placed on a do-not-call list, in violation of the Telephone Consumer Protection Act ("TCPA") (Dkt. No. 1.)[1] Defendant moves to transfer venue to the United States District Court for the Northern District of Illinois pursuant to 28 U.S.C. § 1404(a) based on a forum selection clause in its website's Terms of Use, or, in the alternative, to stay this matter and compel arbitration under 9 U.S.C. § 2. (Dkt. No. 18.) After carefully considering the parties' written submissions, the Court concludes oral argument is unnecessary, *see* Civ. L.R. 7-1(b), and GRANTS Defendant's motion to transfer. Defendant's webpage provided Plaintiff with reasonably conspicuous notice that he was agreeing to Defendant's Terms of Use, making the agreement enforceable. Accordingly, the Court disregards Plaintiff's choice of forum and considers only the public-interest factors under 28 U.S.C. § 1404(a), and Plaintiff has not shown those factors overwhelmingly disfavor transfer.[2]

//

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the document.

[2] Because the Court grants Defendant's motion to transfer, the Court does not consider Defendant's alternative motion to compel arbitration. (*See* Dkt. No. 18 at 20-25.)

## BACKGROUND

### I. COMPLAINT ALLEGATIONS

Plaintiff is a resident of Los Angeles, California. (Dkt. No. 1 ¶ 1.) Defendant is a "local commerce marketplace that connects merchants to consumers by offering goods and services at a discount," with its principal place of business in Chicago, Illinois. (*Id.* ¶ 2.) Plaintiff's cellular device serves as his residential telephone and is "assigned a (530) area code, which corresponds to" Humboldt County, California. (*Id.* ¶ 6.) Plaintiff's number is used for personal matters, is "registered to a non-business telephone line," and is "associated with the telephone company as a non-business number." (*Id.* ¶¶ 15-17.)

On March 29, 2026, Plaintiff opted in to "recurring automatized personalized marketing alerts" from Defendant." (*Id.* ¶ 18.) Plaintiff then opted out of those messages. (*Id.*) "Nonetheless, Defendant sent multiple marketing text messages to Plaintiff's telephone, after he revoked consent." (*Id.* ¶ 19.) Those messages "were sent for the purpose of encouraging him to purchase goods or services from Defendant." (*Id.* ¶ 21.) The text messages "violated" Plaintiff's privacy, subjected him to "annoying and harassing" communications, and "occupied Plaintiff's telephone line from legitimate communication." (*Id.* ¶ 23.)

### II. DEFENDANT'S EVIDENCE

Groupon's records show that Plaintiff opened a Groupon account on August 11, 2011 and "would have" accepted Terms of Use dated July 9, 2011. (Dkt. No. 18-1 ¶ 11.) Plaintiff then purchased "prepaid discounted vouchers" from Defendant both in 2012 and 2015. (*Id.* ¶¶ 2, 13.)

On March 29, 2026, the user of Plaintiff's phone number "signed up to receive text messages from Groupon at a URL" which offered the following image:




(Dkt. No. 18-6 ¶¶ 2-3.) Above the sign up button, the promotion states that "by clicking this button, you also agree to [Groupon's] Terms (incl. arbitration) & Privacy Policy." (*Id.*) At the time the user of Plaintiff's phone number signed up, the operative Terms of Use were those published on February 12, 2026 ("February 2026 Terms of Use"). (Dkt. No. 18-1 ¶ 16.) Those terms included a forum selection clause designation "that any Dispute may only be instituted in a state or federal court in Cook County, Illinois/Northern District of Illinois." (Dkt. No. 18-4 at 9.)

Fifteen minutes after the user signed up, the same user "sent a 'STOP' message to the Groupon phone number." (No. 18-6 ¶ 8.) Defendant immediately "confirmed the opt out" via text. (*Id.* ¶ 9.)

**DISCUSSION**

Defendant moves to transfer this case to the Northern District of Illinois under 28 U.S.C. 1404(a). Under 28 U.S.C. § 1404(a), a district court may "transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented . . . [f]or the convenience of parties and witnesses." 28 U.S.C. § 1404(a). In considering such a transfer, courts weigh various factors "and decide whether, on balance, a transfer would serve 'the convenience of parties and witnesses' and otherwise promote 'the interest of justice.'" *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 62–63 (2013) (quoting 28 U.S.C. § 1404(a)). "The calculus changes, however, when the parties'

contract contains a valid forum-selection clause, which represents the parties' agreement as to the most proper forum." *Id.* at 63 (cleaned up). Under such circumstances, "a proper application of § 1404(a) requires that a forum-selection clause be given controlling weight in all but the most exceptional cases." *Id.* at 59–60 (cleaned up). By "[e]nforc[ing] . . . valid forum-selection clauses, bargained for by the parties, [the court] protects their legitimate expectations and furthers vital interests of the justice system." *Id.* at 63 (cleaned up). Accordingly, when presented with such an agreement, the court must disregard the plaintiff's choice of forum and the parties' private interests. *Id.* at 63–64. The court instead weighs the "public-interest factors only," and "those factors will rarely defeat a transfer motion." *Id.* at 64. Further, "the party acting in violation of the forum-selection clause [. . .] must bear the burden of showing that public-interest factors overwhelmingly disfavor a transfer." *Id*. at 67.

Here, the parties agree Plaintiff clicked the sign-up button on Defendant's webpage in March 2026, which granted Defendant permission to send Plaintiff marking communications. (*See* Dkt. No 23-1 ¶ 4 (confirming Plaintiff "encountered the March 29 promotional screen on [his] mobile phone" and "press[ed] the button" to accept the discount offer); Dkt. No. 23 at 8 ("The screen's visual layout is instructive and without any real dispute.").) The parties disagree as to whether clicking that button constituted formation of a contract incorporating the February 2026 Terms of Use.

## I. CONTRACT FORMATION

As the party seeking to enforce the forum selection clause, Defendant "bears the burden of proving the existence of an agreement . . . by a preponderance of the evidence." *Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279, 1283 (9th Cir. 2017) (cleaned up). Because both parties rely on the same Ninth Circuit cases applying California law on contract formation, the Court assumes California law applies. (*See* Dkt. No. 18 at 13; Dkt. No. 23 at 10-11; Dkt. No. 24 at 7); *see also Godun v. JustAnswer LLC*, 135 F.4th 699, 708 (9th Cir. 2025) ("[The Ninth Circuit] ha[s] consistently stated that no differences exist in the law of the different states as to internet contract formation."). "To form a contract under . . . California law, the parties must manifest their mutual assent to the terms of the agreement." *Berman v. Freedom Fin. Network, LLC*, 30

F.4th 849, 855 (9th Cir. 2022). Defendant argues Plaintiff had inquiry notice of the Terms of Use and does not attempt to show Plaintiff had actual notice. (*See* Dkt. No. 24 at 10.)

"In California, internet contracts are classified by the way in which the user purportedly gives their assent to be bound by the associated terms: browsewraps, clickwraps, scrollwraps, and sign-in wraps." *Godun*, 135 F.4th at 708 (cleaned up). When, as here, "a link to the Terms of Service was provided to Plaintiff[] but [he] w[as] not required to separately indicate that [he] had read or agree[d] with those terms before using [Defendant's] service," "the inquiry-notice 'sign-in wrap' analytical framework" applies. *Id.* "[A]n enforceable contract will be found based on an inquiry notice theory only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Berman*, 30 F.4th 856.

### A. Conspicuous Notice

To determine whether a website provides reasonably conspicuous notice of its terms such that a "reasonably prudent Internet user would have seen it," courts consider "the placement of the notice" and "the context of the transaction." *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 515–16 (9th Cir. 2023) (cleaned up). "Both aspects 'should be considered together.'" *Godun*, 135 F.4th at 709 (quoting *Chabolla v. ClassPass Inc.*, 129 F.4th 1147, 1155 (9th Cir. 2025)).

#### 1. Visual Conspicuousness

For notice placement, certain factors are relevant to the "visual analysis of webpages and hyperlinks, such as the location of the advisal on the webpage or the font size, color, and contrast." *Godun*, 135 F.4th at 709; *see also Berman*, 30 F.4th at 856–57 (considering notice to be insufficiently conspicuous when the notice was printed in a "barely legible" gray font that also failed to denote the existence of a hyperlink in a recognizable way, such as in blue font or all capitalized letters). "This is necessarily a visual and aesthetic analysis" focusing on whether "a reasonably prudent Internet user would have seen" an advisal notice. *Godun*, 135 F.4th at 709 (cleaned up). Plaintiff insists Defendant's website did not provide reasonably conspicuous visual notice.

The placement and visual characteristics of "Terms (incl. arbitration)" provided reasonably conspicuous notice. The words "Terms (incl. arbitration)" and "Privacy Policy" are each underlined and capitalized as though they are proper nouns, features which contrast the words from the surrounding text. (*See* Dkt. No. 18-6 ¶ 3.) "Terms (incl. arbitration) & Privacy Policy" also appears in the paragraph directly above the "Get $10 Off $20 local deal" sign-up button, in the last sentence of the paragraph. So, because people read from top to bottom, "a reader would naturally see the notice before their eyes move to" the sign-up button. *Beltran v. Nationstar Mortg. LLC*, No. 25-cv-04412-JSC, 2026 WL 637337, at *5 (N.D. Cal. Mar. 6, 2026). The Ninth Circuit has similarly found "interject[ing] notice of the terms and conditions directly above or below the relevant action item in a manner disrupting the natural flow of actions" to directly contribute to conspicuousness. *Chabolla*, 129 F.4th at 1157. Although the hyperlink is not blue, *see Berman*, 30 F.4th 849 at 857, the contrasting features, coupled with a lack of distracting features elsewhere on the webpage and its placement directly above the sign-up button, make "Terms (incl. arbitration) & Privacy Policy" stand out enough for a reasonable internet user to notice it and recognize it is a hyperlink to a separate webpage.

Aside from the visual design, Plaintiff argues he "did not notice or read the 'Terms (incl. arbitration)' disclosure before clicking the button." (Dkt. No. 23 at 11.) But, under Ninth Circuit law, courts are guided by what a "reasonably prudent user" would have seen, not what Plaintiff actually saw. *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014). Plaintiff also contends "he encountered this screen on his phone, where the disclosure appeared even smaller and less legible than in the static exhibit Groupon submits." (Dkt. No. 23 at 11.) Beyond this conclusory assertion, Plaintiff neither offers details on how much smaller or less legible the actual disclosure was nor provides an alternative screenshot to that offered by Defendant. On the contrary, Plaintiff proceeds to analyze conspicuousness using the screenshot provided by Defendant. (*See id.* at 13.) On the record before it, the Court must assume the screenshot submitted by Defendant is representative of what Plaintiff encountered.

Plaintiff's reliance on *Ferrell v. SnapCommerce Holdings, Inc.*, No. 25-cv-03160-JST, 2025 WL 3280992 (N.D. Cal. Nov. 25, 2025) is misplaced. The defendant in *Ferrell* not only

“did not ‘do more than simply underscore the hyperlinked text,’” *id.* at *3 (quoting *Berman*, 30 F.4th at 857), but it also placed the link to its terms of use “in very small, gray font on a white background at the bottom of a page” in a size “smaller than any other font on the page.” *Id.* The screen from *Ferrell* shows how inconspicuously the defendant placed its terms of use:




*Id.* at *1. Here, in contrast, the link to Defendant’s terms of use was not at the bottom of the page, but rather directly above the sign-up button, and in black font, not gray. Thus, the reasoning in *Ferrell* does not, as Plaintiff argues, “fit[] Groupon’s screen.” (Dkt. No. 23 at 12.) *Berman*, on which Plaintiff also relies, is even further afield. The defendant used “a font so small that it is barely legible to the naked eye” and included “other visual elements [which] draw the user’s attention away from the barely readable critical text.” *Berman*, 30 F.4th 849 at 857. Defendant, in contrast, used a legible font on a screen with few other visual elements. Finally, Plaintiff includes a comparison to one of the sign-in screens from *Godun*, arguing that case involved “a similar visual scheme as is present here.” (Dkt. No. 23 at 13.) Discussing that page,



United States District Court
Northern District of California

United States District Court
Northern District of California

the *Godun* court leaned heavily on its assessment "[t]he advisal is not, however, located directly above or below the action button and is displayed in relatively small text." *Godun*, 135 F.4th at 712. That differentiates the *Godun* "visual scheme" from the one here, in which Defendant put the advisal directly above the action button. Put differently, the cases on which Plaintiff relies involved sign-in screens with far busier visual elements, disclosures placed outside the flow of user actions, or far more difficult to read text than the one Plaintiff encountered.

**2. Transaction Context**

Next, courts consider "the full context of the transaction." *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 497 (2021). In transactions that entail a continuing relationship, as opposed to "one-time" interaction, courts assume a reasonably prudent user would be more likely to expect to be governed by some terms and thus be on notice of a link to those terms. *See id.* at 476–77 (noting a user would expect an ongoing relationship with contractual terms when they download an app and register for an account, but not when the user merely begins a $5 trial or is engaging in a "one-time" purchase).

Neither party addressed this element of the formation analysis in their submissions. However, it is uncontested that Plaintiff had used Defendant's services in the past. (*See* Dkt. No. 23 at 14 (accepting as true account creation and purchases); Dkt. No. 23-1 ¶ 6 (same).) And, Defendant's promotion prominently included multiple indications of future, ongoing communications from Defendant. (Dkt. No. 18-6 ¶ 3 ("Plus, be the first to know the latest offers and more"); *id.* (" . . .when you sign up for texts"); *id.* ("By clicking this button, you agree to receive recurring automated marketing text messages . . . .").) Thus, Plaintiff did not "simply purchase[] goods or avail[] [him]self of a one-time discount offer." *Chabolla*, 129 F.4th at 1155. Rather, Plaintiff used a service to which he had long held an account and agreed to accept future communications. However, the transaction lacked many of the other indicators courts have used to identify a "continuing forward-looking relationship," such as having a "full registration process," entering credit card information, or downloading an application onto the user's phone. *Godun*, 135 F.4th, at 710. Thus, the relationship is much like the one in *Chabolla* in which the court "decline[d] to find that [plaintiff] had *zero* indication her relationship with [defendant]

would be ongoing" but also "decline[d] to find that the nature of whatever relationship formed gave her reason to look for additional terms and conditions not explicitly listed on [defendant's] website." *Chabolla*, 129 F.4th at 1156. Thus, as in *Chabolla*, "the 'context of the transaction' at issue here neither weighs in favor of nor against the notice requirement." *Id.*

### B. Unambiguous Manifestation of Assent

The requirement a consumer take some action to manifest assent is also met. "[A] webpage must explain that certain actions will be understood by the offeror to signal assent to contractual terms . . . [a]nd it must identify what, exactly, those actions are." *Godun*, 135 F.4th at 711. Defendant's website does so. Defendant's website states: "By clicking this button, you also agree to our Terms (incl. arbitration) & Privacy Policy." (Dkt. No. 18-6 ¶ 3); *see also Godun*, 135 F.4th at 711 (explaining "explicit advisement generally looks like an explanatory clause, usually at the beginning of an advisal" such as 'By *clicking* the Continue [] button' or 'By *tapping* "Play"' (cleaned up)). Plaintiff was therefore advised pressing the "Get $10 Off $20 local deal when you sign up for texts" button would manifest assent to the Terms of Use, and he does not dispute he did press the button. (Dkt. No. 23-1 ¶¶ 3-4.) So, Plaintiff manifested assent to the Terms of Use.

***

Although the transaction context is neutral as to reasonable conspicuous notice, the notice's placement and visual characteristics were sufficient to put Plaintiff on inquiry notice of the Terms of Use. Plaintiff also manifested assent to the agreement by clicking the sign-up button. So, Plaintiff assented to the forum selection clause in the Terms of Use when he clicked the sign-up button in March 2026.[3]

## II. APPLICABILITY OF FORUM SELECTION CLAUSE

The February 2026 Terms of Use contain the following forum selection clause:

> If for any reason a Dispute proceeds in court: (i) . . . you and Groupon agree that any Dispute may only be instituted in a state or federal court in Cook County, Illinois/Northern District of Illinois; (ii) you and

[3] Because the Court concludes an agreement between Plaintiff and Defendant existed at the time Plaintiff clicked the sign-up button in March 2026, it declines to reach Defendant's arguments that Plaintiff assented to an agreement when he created his Groupon account in 2011 or when he completed Groupon transactions in 2012 and 2015. (*See* Dkt. No. 18 at 10; Dkt. No. 24 at 8-10.)

> Groupon irrevocably consent and submit to the exclusive personal jurisdiction and venue of such courts for resolution of such Disputes; and (iii) you and Groupon agree to waive any right to a trial by jury.

(Dkt. No. 18-4 at 9.) Plaintiff's opposition does not dispute that this clause, if entered into, covers Plaintiff's claim. (*See* Dkt. No. 23 at 10-15 (contesting contract formation but not Defendant's interpretation of the forum selection clause).).[4] Because Defendant raised the applicability of the form-selection clause in its motion, (*see* Dkt. No. 18 at 14-15), "Plaintiff concedes these arguments by failing to address them in her opposition." *Tyler v. Travelers Commercial Ins. Co.*, 499 F.Supp.3d 693, 701 (N.D. Cal. 2020). So, the forum selection clause applies to Plaintiff's claim against Defendant.

***

Accordingly, Defendant has met its burden to show the parties formed a valid and enforceable agreement through Plaintiff's signing up for Defendant's promotional deal and marketing communications. So, the forum selection clause applies.

## III. SECTION 1404(A) PUBLIC INTEREST FACTORS

Because the parties' contract contains a valid forum-selection clause, the forum selection clause is given "controlling weight in all but the most exceptional cases" and the Court disregards Plaintiff's choice of forum and the parties' private interest factors. *Atl. Marine Const.*, 571 U.S. at 63–64 (cleaned up). The Court only considers public-interest factors. *Id.* at 64. Public interest factors include "the administrative difficulties flowing from court congestion[,] the local interest in having localized controversies decided at home[,] and the interest in having the trial of a diversity case in a forum that is at home with the law." *Id.* at 62 n.6. (cleaned up). "As the party acting in violation of the forum-selection clause, [Plaintiff] must bear the burden of showing that public-interest factors overwhelmingly disfavor a transfer." *Id.* at 67. Plaintiff contends both the

[4] Defendant argues the April 2026 Terms of Use, not the February 2026 Terms of Use, should govern. (*See* Dkt. No. 18 at 10, 13-14; Dkt. No 24 at 14.) Plaintiff disagrees. (*See* Dkt. No. 23 at 15.) However, the two sets of terms are identical as to the forum selection clause. (*Compare* Dkt. No. 18-4 at 9 (February 2026 Terms of Use) *with* Dkt. No. 18-5 at 13 (April 2026 Terms of Use).) Accordingly, the Court declines to consider whether "Plaintiff's continued use constituted assent to the updated Terms," (Dkt. No. 24 at 14), and, for the purposes of this motion, relies on the February 2026 Terms of Use.



United States District Court
Northern District of California

United States District Court
Northern District of California

local interest factor and the administrative difficulties factor weigh against transfer. (Dkt. No. 23 at 17.)

Plaintiff argues local interest weighs against transfer because "California has an obvious local interest in a resident's claim that marking communications were sent to him here after he opted out." (*Id.*) But when "Plaintiff is a California resident" suing an Illinois corporation, "both forum states have an interest in adjudicating the controversy." *Fedoroff v. Rocket Mortgage*, No. 26-cv-00702-JSC, 2026 WL 1707021, at *10 (N.D. Cal. June 12, 2026). Plus, local interest alone is insufficient to show the public interest overwhelmingly disfavors transfer, particularly when other factors weigh in favor of transferring. For starters, the Northern District of Illinois has more familiarity with the Illinois law governing the parties' agreement. (*See* Dkt. No. 18-4 at 7 ("Any disputes arising out of or related to these Terms of Use and/or any use by you of the Site or Groupon's services shall be governed by the laws of the State of Illinois, without regard to its choice of law rules . . . ."). And when a plaintiff asserts a putative nationwide class action, the interest of one state "is not much different from the interest all other states have" in the case. *Greben v. Cimmar, LLC*, No. 2:24-cv-10140-MRA-BFM, 2025 WL 1765916, at *5 (C.D. Cal. May 30, 2025).

As to administrative difficulties, Plaintiff argues the Northern District of Illinois "had approximately 7,700 more pending cases, higher weighted filings per judge, and an expected civil-trial timeline more than eighteen months longer" such that Illinois is not "the meaningfully more efficient forum." (Dkt. No. 23 at 17.) However, by other metrics—such as speed from civil filing to disposition or filings per judgeship—the Northern District of California has a higher administrative burden. (*See* Dkt. Nos. 18-12, 18-13.) So, while Plaintiff is right that there is a "mixed picture" on efficiency, (Dkt. No. 23 at 17), he has not met his "burden of showing that public-interest factors overwhelmingly disfavor a transfer" under this factor. *Atl. Marine Const.*, 571 U.S. at 67.

So, given Plaintiff has not demonstrated the public-interest factors overwhelmingly disfavor a transfer, the parties' forum selection clause is given "controlling weight" and transfer to the Northern District of Illinois is appropriate. *Id.* at 63 (cleaned up).

United States District Court
Northern District of California

**CONCLUSION**

For the reasons set forth above, the Court grants Defendant's motion and transfers this case to the Northern District of Illinois. Plaintiff assented to a valid, enforceable forum selection clause and has not shown the public-interest factors overwhelmingly disfavor transfer.

This Order disposes of Docket No. 18.

**IT IS SO ORDERED.**

Dated: October 14, 2026

JACQUELINE SCOTT CORLEY
United States District Judge